IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

DONNA KAY CLEMMONS            )
                             )        Consolidated Cases
v.                           )        No. 3:09-0356
                             )        and 3:09-0384
MICHAEL J. ASTRUE,           )
Commissioner of Social Security )

To: The Honorable John T. Nixon, Senior District Judge

## REPORT AND RECOMMENDATION

The plaintiff filed this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the plaintiff's claim for Disability Insurance Benefits ("DIB"), as provided by the Social Security Act ("the Act").

Upon review of the administrative record as a whole, the Court finds that the Commissioner's determination that the plaintiff was not disabled under the meaning of the Act is not supported by substantial evidence in the record as required by 42 U.S.C. § 405(g), and that the plaintiff's motion for judgment on the record (Docket Entry No. 19) should be granted to the extent that this case should be remanded for further action in accordance with the recommendations contained herein.

## I. INTRODUCTION

The plaintiff filed applications for DIB and Supplemental Security Income ("SSI") on December 8, 2003, with an alleged onset date ("AOD") of December 31, 1998, due to interstitial

-1-

cystitis, irritable bowel syndrome ("IBS"), high blood pressure, depression, chronic iron deficiency, anemia, acid reflux disease, premenstrual disorders, pelvic pain, fatigue, frequent urination, joint pain, severe abdominal pain and cramps, lower back pain, an inability to concentrate and complete tasks, and memory problems.[1] (Tr. 71-73, 76.) Her applications were denied initially and upon reconsideration. (Tr. 43-50.)

A hearing before Administrative Law Judge ("ALJ") William F. Taylor was held on March 6, 2006, and it was continued to allow the plaintiff's non-attorney representative more time to find additional medical records. (Tr. 636-44.) A second hearing before the ALJ was held on June 16, 2006 (tr. 645-62), and the plaintiff amended her AOD to December 1, 2004.[2] (Tr. 648-49.) The ALJ delivered a "fully favorable" bench decision on June 19, 2006 (Tr. 20-23, 659-62), which enabled the plaintiff to receive SSI but precluded her from receiving DIB since her date last insured ("DLI"), December 31, 2003, occurred before her amended AOD of December 1, 2004. (Tr. 36.) The plaintiff sought review of this decision by the Appeals Council (tr. 18) and on November 20, 2007, the Appeals Council denied the plaintiff's request for review (tr. 15-17), and the ALJ's decision became the final decision of the Commissioner. The plaintiff obtained an attorney to represent her on November 28, 2007 (tr. 11-14), and petitioned for a "reopening" of her case. (Tr. 10.) On May 30, 2008, the Appeals Council denied the plaintiff's request to re-open her case (tr. 8-9) and on March 30, 2009, the Appeals Council granted the plaintiff's request for additional time to file a civil action. (Tr. 6-7.)

---

[1] The record indicates that the plaintiff's SSI application and documents pertaining to that filing were not included in the record. (Tr. 4-5.)

[2] The decision was not reduced to writing except in summary form in the June 19, 2006, Notice of Decision. (Tr. 20.)

The plaintiff first filed this action pro se before she obtained counsel. Counsel filed a second action on her behalf without realizing the first action had been filed. Upon her motion, the two cases have been consolidated, with the earlier filed case as the lead case. *See* Docket Entry Nos. 6 and 8.

## II. BACKGROUND

The plaintiff was born on July 23, 1970, and was 34 years old as of December 1, 2004, her amended AOD. (Tr. 36, 71.) She completed high school and a two-year Associate's Degree in Occupational Therapy at Nashville State Technical Community College (tr. 82, 649) and worked as a certified nurse technician, grocery store cashier, and telemarketing customer service representative. (Tr. 107-14.)

### A. Chronological Background: Procedural Developments and Medical Records[3]

On April 20, 1999, and October 19, 1999, the plaintiff presented to Dr. Charles D. Albury, Jr., an oral surgeon at Southeastern Oral and Maxillofacial Surgery, with complaints of severe migraine headaches, left shoulder pain, and jaw pain with temporomandibular joint ("TMJ")[4] clicking. (Tr. 236-40.) Dr. Albury noted that the plaintiff suffered a whiplash injury on

---

[3] Since the ALJ awarded SSI to the plaintiff based on an amended onset date of December 1, 2004 (tr. 38-42), the Court will focus on the plaintiff's treatment notes and medical records that preceded her amended onset date.

[4] The temporomandibular joint of the jaw connects the upper temporal bone, which is part of the cranium, to the lower jaw bone. Dorland's Illustrated Medical Dictionary 1863 (30th ed. 2003) ("Dorland's").

-3-

December 31, 1997; diagnosed the plaintiff with right TMJ disc disorder, myositis,[5] and bruxism;[6] prescribed muscle relaxers and non-steroidal anti-inflammatory drugs ("NSAIDs"); and recommended that she use a mouth guard and eat soft foods. *Id.* The plaintiff's pain persisted and she underwent a right mandibular condylotomy in December of 1999. (Tr. 145-46, 236.) In September of 2000, the plaintiff reported that "her headaches, jaw pain, jaw noise, and her ability to eat without problems was better" and that she "was 70% better," and Dr. Albury noted that her "postop xrays were very good" and that her prognosis was "good." (Tr. 236.)

On April 19, 2000, Dr. William Mays, a psychiatrist with the Tennessee Christian Medical Center, completed a Psychiatric Evaluation (tr. 153-55) and noted that the plaintiff reported being in car accidents in December of 1997, "which resulted in [a] fractured collar bone and chronic current headaches," and in July of 1999, "which caused a fractured elbow and other physical problems." (Tr. 153.) The plaintiff also reported having recurrent intrusive and distressing memories, dreams, and flashbacks of her automobile accidents; intense psychological distress when driving; feelings of detachment and estrangement; difficulty falling asleep and concentrating; and excessive anxiety and irritability. *Id.* He noted that the plaintiff had normal thought processes, memory, attention span, knowledge, abstract reasoning, and judgment, and a euthymic mood. (Tr. 154.) Dr. Mays diagnosed the plaintiff with post-traumatic stress disorder ("PTSD"), migraine headaches, jaw misalignment, and chronic pain; assigned her a Global Assessment of Functioning

---

[5] Myositis is "inflammation of a voluntary muscle." Dorland's at 1217.

[6] Bruxism is the "involuntary, nonfunctional, rhythmic or spasmodic gnashing, grinding, and clenching of teeth" that usually occurs during sleep. Dorland's at 257.

-4-

("GAF") score of 80;[7] and prescribed Trazodone[8] and Paxil.[9] (Tr. 154-55.)  The plaintiff reported that she was pleased with her prescribed medications. (Tr. 155.)

Between September of 2002, and December of 2003, the plaintiff presented to Dr. Mitchell A. Toomey at Tennessee Oncology with complaints of fatigue and lower abdominal pain. (Tr. 206-34.)  Dr. Toomey diagnosed the plaintiff with iron deficiency anemia and frequent urination and prescribed a multivitamin containing iron and an iron IV. *Id.*  On January 8, 2003, the plaintiff presented to Dr. Bob Herring, a gastrointestinal specialist, with complaints of abdominal pain that is exacerbated when she lifts objects, heartburn, morning nausea, bloating, bowel urgency, and constipation. (Tr. 157.)  Dr. Herring diagnosed the plaintiff with "[m]ild epigastric tenderness," "[e]pigastric and peri-umbilical pain" and pyrosis that was unresponsive to Pepcid and recommended that she undergo an esophagogastroduodenoscopy ("EGD").[10] (Tr. 157-58.)  On February 26, 2003, Dr. Herring noted that the plaintiff's biopsies were unrevealing and that her ultrasound was negative, but that she was "still having symptomatology." (Tr. 156.)

_____

[7] The GAF scale considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 43 (4th ed. 2000) ("DSM-IV-TR").  A GAF score within the range of 71-80 means that "[i]f symptoms are present, they are transient and expectable reactions to psychosocial stressors; no more than slight impairment in social, occupational, or school functioning." *Id.*

[8] Trazodone is an antidepressant serotonin uptake inhibitor that may also be used for relief of anxiety disorders.  Saunders Pharmaceutical Word Book 716 (2009) ("Saunders").

[9] Paxil is prescribed for the treatment of major depressive disorder and general anxiety disorder. Saunders at 536.

[10] An esophagogastroduodenoscopy is an "endoscopic examination of the esophagus and the stomach." Dorland's at 642.

-5-

Between March of 2003, and December of 2004, the plaintiff presented to Dr. Gita Mishra, her primary care physician with the Donelson Family Practice, on multiple occasions with complaints of acid reflux, abdominal pain, fatigue, headaches, bloating, constipation, dizziness, high blood pressure, chest tightness, allergies, knee pain, and difficulty concentrating and sleeping. (Tr. 505, 511, 514, 517, 519-22, 525.) Dr. Mishra diagnosed the plaintiff with constipation, gastroesophageal reflux disease ("GERD"), cystitis, chronic fatigue syndrome, vertigo, hypertension, IBS, depression, and anxiety, and she prescribed Meclizine,[11] Nexium,[12] Zelnorm,[13] Elmiron,[14] Atenolol,[15] Protonix,[16] Ultram,[17] Naprosyn,[18] Zoloft,[19] HCTZ,[20] Bextra,[21] and Aciphex.[22]

---

[11] Meclizine is prescribed to treat motion sickness. Saunders at 432.

[12] Nexium is used to treat GERD. Physicians' Desk Reference 695 (65th ed. 2011) ("PDR").

[13] Zelnorm is prescribed to treat IBS. Saunders at 774.

[14] Elmiron is prescribed to treat urinary tract inflammation and interstitial cystitis. Saunders at 257.

[15] Atenolol is a beta-blocker that is used to treat high blood pressure. Saunders at 68.

[16] Protonix is used to treat GERD. Saunders at 590.

[17] Ultram is a pain reliever prescribed for moderate to severe pain. Saunders at 739.

[18] Naprosyn is a NSAID used to treat "mild to moderate pain." Saunders at 252.

[19] Zoloft is a selective serotonin reuptake inhibitory used to treat depression, obsessive-compulsive disorder, panic disorder, PTSD, PMDD, and social anxiety disorder. Saunders at 779.

[20] HCTZ is an antihypertensive and a diuretic. *Id.* at 351.

[21] Bextra is no longer available in the United States but it was a nonsteroidal anti-inflammatory drug prescribed for arthritis. Saunders at 95.

[22] Aciphex is a proton-pump inhibitor prescribed to treat GERD and ulcers. PDR at 993.

*Id.* On February 23, 2004, x-rays of the plaintiff's right shoulder and chest were "normal" and revealed "no abnormalities." (Tr. 313-14.)

On March 4, 2003, Dr. Joe M. MacCurdy conducted a "transabdominal sonography" which revealed that the plaintiff had "a moderate amount" of non-complex fluid in her pelvis and "small follicular cysts within each ovary without evidence of [an] ovarian mass." (Tr. 316.)

Between March of 2003, and November of 2003, the plaintiff presented to Dr. Maria Perales, a gynecologist, with complaints of lower abdomen pain, fatigue, severe breast tenderness, lower back pain, sore throat, and dyspareunia.[23] (Tr. 172-75, 187-95.) Dr. Perales noted that the plaintiff had normal gynecological exams; diagnosed her with severe breast tenderness, premenstrual dysmorphic disorder ("PMDD") symptoms, dysmenorrhea,[24] dyspareunia, chronic pelvic pain, back pain, and chronic endometritis;[25] performed a laproscopy,[26] which revealed that the plaintiff had uterine adhesions, and prescribed Zoloft, Bextra, Doxycycline,[27] and Flagyl.[28] *Id.* A July 15, 2003, mammogram showed no malignancy or suspicious abnormality (tr. 202-04) and a July 29, 2003, trasnabdominal pelvic ultrasound revealed a "[l]arge follicle of the left ovary" but was otherwise normal. (Tr. 200-01.)

---

[23] Dyspareunia is "difficult or painful sexual intercourse." Dorland's at 576.

[24] Dysmenorrhea is painful menstruation. Dorland's at 575.

[25] Chronic endometritis is skin inflammation. Dorland's at 614.

[26] A laproscopy is a "examination of the interior of the abdomen by means of a laproscope." Dorland's at 998.

[27] Doxycycline is an antibiotic that is used to treat rosacea. Saunders at 242.

[28] Flagyl is prescribed to treat ulcers. Saunders at 292.

On August 12, 2003, Dr. Maurice C. Barnes, a gastroenterologist, also examined the plaintiff and diagnosed her with anemia, constipation, GERD, and back pain, and prescribed Bextra and Nexium. (Tr. 162.) He conducted an EGD and colonoscopy on the plaintiff and both were normal. (Tr. 160, 167-71.)

On September 19, 2003, the plaintiff presented to Dr. Phillip Porch III, a surgeon with Urology Associates, P.C., with complaints of abdominal pain and he noted that she was "positive for abdominal pain, constipation, frequent urination, back pain, and seasonal allergies." (Tr. 257.) On October 29, 2003, Dr. Porch performed a cystoscopy,[29] which confirmed that the plaintiff had uterine adhesions. (Tr. 181-84.) On November 3, 2003, the plaintiff returned to Dr. Porch and he conducted a second cystoscopy; gave her a bladder instillation of Marcaine,[30] Kenalog,[31] and Heparin;[32] and prescribed Lortab[33] and Elmiron. (Tr. 256.) On November 10, 2003, Nancy Hayden, a registered family nurse practitioner ("FNP") with Urology Associates, examined the plaintiff and diagnosed her with interstitial cysitis; administered a bladder instillation of Marcaine, Kenalog, and Heparin; and noted that "[s]he has enough criteria to be considered disabled." (TR. 253-54.) On November 20, 2003, the plaintiff presented to Dr. Porch and she related that she did not have "much relief" from her bladder instillation. (Tr. 252.) Dr. Porch suggest that the plaintiff undergo "a couple

---

[29] A cystoscopy is "a direct visual examination of the urinary tract with the cystoscope." Dorland's at 467.

[30] Marcaine is a local anesthetic. Saunders at 426.

[31] Kenalog is a corticosteroid anti-inflammatory. Saunders at 388.

[32] Heparin is an anticoagulant. Saunders at 338.

[33] Lortab is a pain reliever with the generic name of hydrocodone. Saunders at 415.

-8-

more" bladder instillations and he prescribed Atarax[34] and Uro Blue.[35] *Id.* The plaintiff underwent additional bladder instillations on November 24, 2003, and on December 1, 2003. (Tr. 248-51.)

On December 12, 2003, the plaintiff presented to Dr. Mark Dickinson at Urology Associates, P.C., and related that her bladder instillations did not provide any relief. (Tr. 247.) Dr. Dickinson diagnosed her with interstitial cystitis and prescribed Cipro,[36] Uro Blue, and a Medrol Dosepak.[37] *Id.* Between December of 2003, and February of 2004, the plaintiff presented to Dr. Porch on several occasions with complaints of bladder spasms, severe pelvic and lower back pain that radiated down to her lower extremities, dizziness, headaches, and knee pain. (Tr. 243-46.) Dr. Porch diagnosed her with interstitial cystitis and urinary frequency and prescribed Cipro, Detrol, Oxytrol,[38] Tofranil,[39] Lortab, Bextra, and Mobic.[40] *Id.*

On February 3, 2004, the plaintiff presented to Dr. Toomey for a follow up visit regarding her anemia and he noted that she had "favorable" blood counts. (Tr. 321.) On February 23, 2004, Dr. Porch examined the plaintiff and noted that medication had resolved her dizziness, that her knee

---

[34] Atarax is an anxiolytic and minor tranquilizer. Saunders at 68.

[35] Uro Blue is an urinary antibiotic. Saunders at 742.

[36] Cipro is an antibiotic. Saunders at 162.

[37] Medrol Dosepak is anti-inflammatory medication. Saunders at 433.

[38] Detrol and Oxytrol are prescribed for urinary frequency, urgency, and incontinence. Saunders at 214, 525.

[39] Tofranil is a tricyclic anti-depressant. Saunders at 710.

[40] Mobic is a NSAID that is used to treat arthritis, ankylosing spondylitis, acute bursitis, and tendinitis. Saunders at 457.

pain was "gone," and that the discomfort in her bladder was "better." (Tr. 619.) His treatment plan consisted of a bladder instillation of Marcaine, Kenalog, Heparin, and Dimethyl Sulfoxide.[41] *Id.*

Between March and May of 2004, the plaintiff presented multiple times to Ms. Hayden and to Dr. Porch. (Tr. 606-18.) Ms. Hayden diagnosed the plaintiff with interstitial cystitis followed by an urinary tract infection; gave her Zyrtec[42] samples and antibiotic injections; and noted that her prescribed medication provided limited relief from her bladder symptoms and that she had back pain. (Tr. 608-10, 613, 615, 617-18.) Dr. Porch noted that the plaintiff's bladder and menstrual symptoms improved after having a bladder instillation, monitored her after treatment for interstitial cystitis, and provided Darvocet[43] and Marcaine, Kenalog, and Heparin bladder instillations. (Tr. 606-07, 614, 616.) On April 1, 2004, the plaintiff returned to Dr. Porch with complaints of urinary frequency, spasms in her back and pelvic area, and abdominal pain, and related that her previous instillation resulted in only short term improvement. (Tr. 614.) On April 8, 2004, the plaintiff presented with a urinary tract infection and with worsening urinary frequency. (Tr. 613.) On April 13, 2004, the plaintiff reported that her symptoms had improved (tr. 608-09) and on April 15, 2004, she underwent successful surgery to repair a small hernia. (Tr. 260.)

On May 12, 2004, Dr. Linda Blazina, Ph.D., an examining Tennessee Disability Determination Services ("DDS") psychologist, completed a psychiatric evaluation (tr. 265-69) and noted that the plaintiff had mild psychomotor retardation, had a depressed mood, had a restricted affect, was logical and coherent, was fully oriented, had mildly impaired attention and concentration

---

[41] Dimethyl Sulfoxide is anti-inflammatory medication prescribed to treat interstitial cystitis. Saunders at 230.

[42] Zyrtec is prescribed to treat allergies. Saunders at 782.

[43] Darvocet is a narcotic pain-reliever and fever-reducer. Saunders at 202.

-10-

skills, and had average intelligence. (Tr. 266.) The plaintiff reported feeling depressed and nervous, having appetite and sleep disturbances, being irritable, having difficulty concentrating, having no suicidal or homicidal ideation, having no current symptoms of PTSD, and having pain in her legs, pelvis, back, and abdomen. *Id.* She also related that she had no difficulty in completing self-care skills, could drive but did not like to, goes shopping, attends church, walks for exercise, cares for her daughter, cleans, has little trouble getting along with others, and does not "have any good days because of pain." (Tr. 267.) Dr. Blazina diagnosed the plaintiff with adjustment disorder with mixed anxiety and a depressed mood, assigned her a GAF score of 70 to 75,[44] and opined that she had multiple health problems, had no noticeable limitations in her ability to understand and remember or interact with others, and had mild limitations in her ability to sustain concentration and persistence, to adapt to changes in a work routine, and to tolerate stress. (Tr. 268-69.)

On May 17, 2004, Dr. Roy Johnson, an examining DDS physician, completed a physical examination (tr. 270-71) and diagnosed the plaintiff with interstitial cystitis, TMJ disorder, IBS, hypertension, and memory deficit. (Tr. 271.) He opined that the plaintiff had no restrictions sitting, that in an eight hour workday she "should avoid standing for more than six hours," and that she could lift/carry 30 pounds occasionally and 15 pounds frequently. (Tr. 271-72.) On May 19, 2004, the plaintiff presented to Dr. Mishra with complaints of coughing, allergies, and left knee pain, and

---

[44] A GAF score of 70-75 means that the plaintiff either has "[s]ome mild symptoms [or] some difficulty in social, occupational, or school functioning, but generally functioning pretty well, has some meaningful interpersonal relationships," or means that "[i]f symptoms are present, they are transient and expectable reactions to psychosocial stressors; no more than slight impairment in social, occupational, or school functioning." DSM-IV-TR at 34.

Dr. Mishra diagnosed her with interstitial cystitis, IBS, constipation, left knee pain, chronic fatigue, and hypertension. (Tr. 214.) She prescribed Atenolol, Nexium, Zoloft, and Clarinex.[45] *Id.*

On May 26, 2004, Dr. Edward L. Sachs, Ph.D., a non-examining consultative DDS psychologist, completed a Psychiatric Review Technique Form ("PRTF") (tr. 287-99) and diagnosed the plaintiff with "adjustment disorder, mixed." (Tr. 290.) He concluded that the plaintiff had mild restriction of activities of daily living; mild difficulties maintaining social functioning, concentration, persistence, or pace; and no episodes of decompensation. (Tr. 297.) Dr. Sachs noted that the plaintiff's medical records indicate that her psychological allegations "are partially credible," but that her "adjustment disorder with mixed anxiety and depression . . . does not significantly impair her memory or concentration or social functioning." (Tr. 299.) Dr. Sachs completed a second PRTF (tr. 273-86) and concluded that there was insufficient evidence to establish a mentally severe impairment for the period of time between the plaintiff's AOD and her DLI. (Tr. 273, 285.) Specifically, Dr. Sachs found that there was "no evidence of [the plaintiff's] mental status" during her alleged period of disability. (Tr. 285.)

On June 3, 2004, Dr. Robert Doster, a nonexamining consultative DDS physician, completed a physical RFC assessment (tr. 300-05) and opined that the plaintiff could lift/carry 50 pounds occasionally and 25 pounds frequently, that in an eight hour workday she could sit or stand for about six hours, and her ability to push/pull was unlimited. (Tr. 301.) He also found that the plaintiff could frequently climb, balance, stoop, kneel, crouch, and crawl (tr. 302), and he noted that her subjective complaints were partially credible because her "symptoms are atypical and out of proportion to the clinical findings," her "anemia has been corrected and is nonsevere," her "allegations of IBS,

---

[45] Clarinex is prescribed for allergies. Saunders at 165.

-12-

GERD, and TMJ can be controlled with med[ication] and are nonsevere singly or in combination," and her hypertension "can be controlled with med[ication]." (Tr. 305.)

In June of 2004, an x-ray of the plaintiff's left knee revealed no abnormalities (tr. 312), an MRI of her left knee showed joint effusion but "no sign of meniscal or ligamentous abnormality" (tr. 311), and she underwent several bladder instillations that provided some relief. (Tr. 602-05.) On June 23, 2004, the plaintiff returned to Dr. Mishra with complaints of knee pain, and Dr. Mishra diagnosed her with hypertension and prescribed Atenolol. (Tr. 511.)

On July 8, 2004, the plaintiff presented to Dr. Porch with complaints of "considerable pain" and urinary frequency and he diagnosed her with interstitial cystitis. (Tr. 601.) On August 3, 2004, the plaintiff presented to Ms. Hayden with complaints of severe back pain and Ms. Hayden diagnosed her with interstitial cystitis and back pain. (Tr. 600.) An August 4, 2004, MRI of the plaintiff's lumbar spine revealed "degenerative disc disease [at] L5-S1 with a small central disc protrusion but producing minimal impression on the thecal sac." (Tr. 463.) On September 28, 2004, the plaintiff returned to Dr. Porch with complaints of "increasing pain" and he diagnosed her with interstitial cystitis and right flank pain. (Tr. 599.) Dr. Porch prescribed a bladder instillation and Lortab. *Id.* On October 1, 2004, the plaintiff underwent an ultrasound of her right calf which revealed no abnormalities. (Tr. 462.) On October 7, 2004, Dr. Toomey examined the plaintiff and noted that she was "doing well" and that her anemia was being controlled with iron IVs and multivitamins. (Tr. 320.)

On October 29, 2004, the plaintiff presented to Dr. Geoffrey Lifferth at the Summit Medical Center emergency room with complaints of severe left shoulder pain (Tr. 460-61) and radiographs revealed a "normal left shoulder" with "no evidence of fracture or dislocation." (Tr. 461.) He opined

-13-

that she had left shoulder pain and a potential ligamentous injury and prescribed Tylox.[46] (Tr. 460.) On November 11, 2004, an MRI of the plaintiff's left shoulder showed "early cystic change within the humeral head" and "evidence of mild supraspinatus and subscapularis tendinopathy" but no rotator cuff tear. (Tr. 457.) On November 23, 2004, an MRI of the plaintiff's right hip revealed no fractures and a structurally normal hip. (Tr. 456.)

On December 13, 2004, the plaintiff presented to Dr. Robert Brod, D.D.S., and he diagnosed her with TMJ. (Tr. 536-37.) Between December of 2004, and September of 2005, she returned to Dr. Brod on multiple occasions for treatment of her TMJ with a transcutaneous electrical nerve stimulation ("TENS") unit.[47] (Tr. 537-38.)

Between May 20, 2005, and March 13, 2006, the plaintiff presented to Carole Burgess, a physician's assistant at the Center for Spine, Joint, and Neuromuscular Rehabilitation, with complaints of chronic low back pain, pelvic pain, and bilateral leg pain. (Tr. 620-35.) Ms. Burgess diagnosed her with fibromyalgia, myofascial pain syndrome, muscle spasms, chronic back pain, chronic interstitial cystis, GERD, cervicalgia, and TMJ disorder, and prescribed Zanaflex, Robaxin, Baclofen,[48] Lortab, Celebrex,[49] Darvocet, and Lidoderm.[50] *Id.*

---

[46] Tylox is a pain reliever. Saunders at 737.

[47] According to Drugs.com, a TENS unit is a small, battery powered device that is used to control many types of pain by sending mild electrical signals through electrodes attached to the skin. Drugs.com, "How to use a TENS unit"at http://www.drugs.com/cg/how-to-use-a-tens-unit.html.

[48] Zanafelx, Robaxin, and Baclofen are skeletal muscle relaxants. Saunders at 77, 619, 773.

[49] Celebrex is a NSAID that is used to treat arthritis. Saunders at 141.

[50] Lidoderm is an "anesthetic for post-herpetic neuralgia." Saunders at 407.

-14-

On January 24, 2006, Ms. Burgess completed a Medical Source Statement (tr. 540-42) and found that the plaintiff could lift/carry less than ten pounds both occasionally and frequently. (Tr. 540.) She noted that in an eight hour workday the plaintiff could stand/walk for less than two hours and could sit for about six hours, and that her ability to push/pull in both her upper and lower extremities was limited. (Tr. 540-41.) Ms. Burgess determined that the plaintiff could only kneel and crouch occasionally; that she could never climb, balance, or crawl; that her ability to reach and handle was limited; and that her exposure to temperature extremes, noise, dust, vibration, humidity/wetness, hazards, and fumes should be limited. (Tr. 541-42.) Ms. Burgess also noted that the plaintiff's trigger points were consistent with fibromyalgia and that the plaintiff's degenerative disc disease supported her opinion of the plaintiff's exertional limitations. (Tr. 541.)

On January 23, 2006, Dr. Porch completed a physical Medical Source Statement of Ability to Do Work-Related Activities ("Medical Source Statement") (tr. 527-29) and opined that the plaintiff could lift/carry ten pounds occasionally and less than ten pounds frequently. (Tr. 527.) He noted that in an eight hour workday the plaintiff could stand/walk for less than two hours and could sit for about six hours, and that the ability of her lower extremities to push/pull was limited. (Tr. 527-28.) Dr. Porch also determined that the plaintiff could only occasionally kneel or crouch; could never climb, balance, or crawl; and should not be exposed to hazards or fumes since she "develops increased bladder pain from some environmental fumes." (Tr. 529.)

On March 1, 2006, Gelia Bilbrey, a licensed clinical social worker, completed a mental Medical Source Statement (tr. 544-45) and concluded that the plaintiff's ability to "[m]aintain attention and concentration for extended periods;" to "[p]erfrom activities within a schedule, maintain regular attendance, and be punctual;" to "[c]omplete a normal workday or workweek;" and

-15-

to "[p]erform at a consistent pace" was poor. (Tr. 544.)  Ms. Bilbrey found that the plaintiff's ability

to "[r]espond appropriately to changes in the work setting" and to "[t]ravel in unfamiliar places or

use public transportation" was fair; diagnosed her with mood disorder, anxiety disorder, and pain

disorder; and assigned her a GAF score of 45.[51]  (Tr. 545.)


## B. Hearing Testimony

On March 6, 2006, the ALJ continued the plaintiff's first hearing so her non-attorney

representative could gather additional medical records and present them to him. (Tr. 637-44.)  The

plaintiff's second hearing was held on June 16, 2006, at which time she was represented by the same

non-attorney representative, and she testified at the hearing. (Tr. 645-62.)

The ALJ began the hearing by noting the absence of medical records sufficient to establish

the onset of disability prior to December 31, 2003, her date last insured for DIB, and upon

questioning by the ALJ, the plaintiff's non-attorney representative suggested that the plaintiff's

AOD be amended to the "soonest date as for the medical records will support it." (Tr. 647.)  The

ALJ reviewed the medical records and found that Dr. Brod's Medical Source Statement from

January of 2006,[52] and Ms. Burgess's Medical Source Statement from March of 2006, were "the two

---

[51] A GAF score of 41-50 falls within the range of "[s]erious symptoms [or] any serious impairment in social, occupational, or school functioning." DSM-IV-TR at 34.

[52] As the plaintiff noted (Docket Entry No. 20, at 5-6), the ALJ erroneously attributed the January 2006 Medical Source Statement to Dr. Brod, the plaintiff's oral surgeon, instead of correctly attributing it to Dr. Porch, the plaintiff's treating urologist. (Tr. 527-29, 648, 661.)  The ALJ's mistake is understandable since the cover letter to the Medical Source Statement, provided by the plaintiff's non-attorney representative, lists Dr. Brod as the "[m]edical provider." (Tr. 526.) However, on the third and last page of the statement, Dr. Porch clearly indicates his specialty as "urology," in contrast to Dr. Brod's oral surgery specialty.  In addition, it would have been peculiar for Dr. Brod, a dentist, to have assessed the plaintiff's physical abilities.

-16-

sets of records . . . that seem to establish, or come close to establishing, disability." (Tr. 648.) The ALJ again asked the plaintiff's non-attorney representative if he agreed with an amended AOD of December 1, 2004, and he answered "[y]es." *Id.* The ALJ explained to the plaintiff's non-attorney representative that this amended AOD would not cover the plaintiff's DIB claim and for a third time, asked the plaintiff's non-attorney representative if he agreed to amend the plaintiff's AOD to December 1, 2004, and he answered "[y]es." *Id.* It is clear that the ALJ chose December 1, 2004, because she began treatment with Dr. Brod in December of 2004. *See* tr. 648.

The plaintiff testified that she had an associate's degree in occupational therapy; that she drives occasionally, but that her driving is limited by headaches, depression, and other health reasons; and that she was last worked in December of 1997, as a customer service representative at JC Penney's telemarketing center. (Tr. 649-51.) The plaintiff related that her disabilities were shoulder pain, arm pain, hand pain, fibromyalgia, acid reflux, pelvic pain, a bladder disorder, lower back pain, problems standing, knee pain, frequent urination, foot swelling, numbness and tingling of her toes and hands, chronic sinusitis, chronic fatigue, and migraine headaches. (Tr. 652.) She testified that she has had five hydrodistention procedures, that she is chronically fatigued, that she lies down frequently, that she has chronic pain, that her medication causes nausea, and that her anemia is controlled by iron IV infusions. (Tr. 653-54.)

The plaintiff described her headaches as "throbbing;" her neck and shoulder pain as "sharp, stabbing pain;" and her lower back and leg pain as "sharp" and "constant." (Tr. 654.) She testified that if she walks "less than a foot" that her "legs act like they're going to give out," that her feet are sore and tender, and that her hands cramp and are frequently numb. (Tr. 655-56.) The plaintiff related that she does not cook and does not perform household chores, that her sister assists her with

-17-

getting dressed and with bathing, that she is depressed because of her disabilities, and that she has

difficulty concentrating and focusing. (Tr. 658-59.)


### III. THE ALJ'S FINDINGS

The ALJ issued a "fully favorable" bench decision on June 16, 2006 (tr. 20-23, 659-62), and

he noted that the plaintiff, "[u]pon advice from her representative," had amended her AOD from

December 31, 1998, to December 1, 2004. (Tr. 20, 659.)  The ALJ explained in the Notice of

Decision that he dismissed the plaintiff's DIB claim because she amended her onset to December 1,

2004, which was after her DLI of December 31, 2003, but that she was disabled as of the amended

onset date and entitled to SSI. (Tr. 20.)  He completed the five step sequential evaluation process

for her SSI claim. (Tr. 20, 38-42, 659-62.)


### IV.  DISCUSSION

**A. Standard of Review**

The determination of disability under the Act is an administrative decision, and the only

questions before this Court are whether the decision of the Commissioner is supported by substantial

evidence and whether the Commissioner employed the proper legal standards in reaching his

conclusion. 42 U.S.C. § 405(g).  *See Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28

L. Ed. 2d 842 (1971) (adopting and defining substantial evidence standard in context of Social

Security cases); *Kyle v. Comm'r Soc. Sec.*, 609 F.3d 847, 854 (6th Cir. 2010).  The Commissioner's

decision must be affirmed if it is supported by substantial evidence, "even if there is substantial

evidence in the record that would have supported an opposite conclusion." *Blakely v. Comm'r of*

-18-

*Soc. Sec.,* 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir.1997)); *Jones* v. *Comm'r of Soc. Sec.,* 336 F.3d 469, 477 (6th Cir. 2003); *Her v. Comm'r of Soc. Sec.,* 203 F.3d 388, 389-90 (6th Cir. 1999). Substantial evidence is defined as "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)); *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007); *Le Master v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976) (quoting Sixth Circuit opinions adopting language substantially similar to that in *Richardson*).

A reviewing court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *See, e.g., Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (citing *Myers v. Richardson*, 471 F.2d 1265, 1268 (6th Cir. 1972)). The Court must accept the ALJ's explicit findings and determination unless the record as a whole is without substantial evidence to support the ALJ's determination. 42 U.S.C. § 405(g). *See, e.g., Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365, 366 (6th Cir. 1984).

The Commissioner must employ a five-step evaluation process in determining the issue of disability. *See, e.g., Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (citing *Abbot v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)). The original burden of establishing disability is on the plaintiff, and impairments must be demonstrated by medically acceptable clinical and laboratory diagnostic techniques. *See* 42 U.S.C. § 1382c(a)(3)(D); 20 C.F.R. §§ 404.1512(a), (c), 404.1513(d). First, the plaintiff must show that she is not engaged in "substantial gainful activity" at the time she seeks disability benefits. *Id.* (citing 20 C.F.R. §§ 404.1520(b), 416.920(b))); *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 539 (6th Cir. 2007). A plaintiff who is performing substantial gainful activity

-19-

is not disabled no matter how severe the plaintiff's medical condition may be. *See, e.g., Dinkel v. Sec'y of Health & Human Servs.*, 910 F.2d 315, 318 (6th Cir. 1990).

Second, the plaintiff must show that she suffers from a "severe impairment." A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id.* (citing 20 C.F.R. §§ 404.1520(c), 416.920(c)). Basic work activities are "the abilities and aptitudes necessary to do most jobs," such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; [c]apacities for seeing, hearing, and speaking; [u]nderstanding, carrying out, and remembering simple instructions; [u]se of judgment; [r]esponding appropriately to supervision, co-workers and usual work situations; and [d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b). The Commissioner is required to consider the combined effects of impairments that individually are not severe but cumulatively may constitute a severe impairment. 42 U.S.C. § 423(d)(2)(B); *Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988).

Third, if the plaintiff is not engaging in substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and her impairment meets or equals a listed impairment, the plaintiff is presumed disabled without further inquiry, regardless of age, education or work experience. *Foster*, 853 F.2d at 490 (citing 20 C.F.R. §§ 404.1520(d), 416.920(d)). The plaintiff may establish that she meets or equals a listed impairment, and that the impairment has lasted or is expected to last for at least twelve months or result in death. *See Listenbee v. Sec'y of Health & Human Servs.*, 846 F.2d 345, 350 (6th Cir. 1988). The plaintiff is not required to show the existence of a listed impairment in order to be found disabled, but such a showing results in an automatic finding of disability. *See Blankenship v. Bowen*, 874 F.2d 1116, 1122 (6th Cir. 1989).

-20-

Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, she is not disabled. *Id.* The plaintiff has the burden of proving inability to perform past relevant work, or proving that a particular past job should not be considered relevant. *Cruse*, 502 F.3d at 539; *Jones*, 336 F.3d at 474 ("Through step four, the [plaintiff] bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work."); *Smith v. Sec'y of Health & Human Servs.*, 893 F.2d 106, 109 (6th Cir. 1989). If the plaintiff fails to carry this burden, she must be denied disability benefits.

Once the plaintiff establishes a *prima facie* case that she is unable to perform her prior relevant employment, the burden shifts in step five to the Commissioner to show that the plaintiff can perform other substantial gainful employment, and that such employment exists in the national economy. *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005). *See, e.g., Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). To rebut a *prima facie* case, the Commissioner must come forward with proof of the existence of other jobs a plaintiff can perform. *Longworth*, 402 F.3d at 595. *See also Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert. denied*, 461 U.S. 957, 103 S.Ct. 2428, 77 L.Ed.2d 1315 (1983) (upholding the validity of the medical-vocational guidelines grid as a means for the Commissioner of carrying his burden under appropriate circumstances). It remains the plaintiff's burden to prove the extent of her functional limitations. *Her*, 203 F.3d at 391. Even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the plaintiff can perform, she is not disabled. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009); *Her*, 203 F.3d at 391. *See also Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1028-29 (6th Cir.

1990); *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 88-89 (6th Cir. 1985); *Mowery v. Heckler*, 771 F.2d 966, 969-70 (6th Cir. 1985).

If the question of disability can be resolved at any point in the sequential evaluation process, the claim is not reviewed further. 20 C.F.R. § 404.1520(a)(4). *See also Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (holding that resolution of plaintiff's claim at step two of the evaluative process is appropriate in some circumstances).

## B. The five step inquiry

Although the ALJ did not enter a written decision, in his ruling from the bench and in the Notice of Decision, it is clear that the ALJ resolved the plaintiff's case at step five of the five-step process. At step one, the ALJ found that the plaintiff had not engaged in substantial gainful activity since her amended onset date. (Tr. 38, 659-60.) At step two, the ALJ determined that the plaintiff had the following severe impairments: fibromyalgia, myofascial pain syndrome, cystitis, GERD, status post five bladder surgeries, anemia, TMJ pain, IBS, hypertension, adjustment disorder with mixed depression and anxiety, and migraine headaches. (Tr. 20, 40, 660.) At step three, the ALJ concluded that the plaintiff did not have an impairment or combination of impairments that met or medically equaled the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 41, 660.) At step four, the ALJ concluded that based on Dr. Brod's January 23, 2006, Medical Source Statement, the plaintiff could perform "a less than full range of sedentary work activity" and could not perform her past relevant work. (Tr. 41, 660.) He gave controlling weight to Dr. Brod's Medical Source Statement since he was a treating physician and his opinions were supported by the plaintiff's history and medical records. (Tr. 42.) At step five, the ALJ determined that, pursuant to

-22-

Grid Rule 201.00, the plaintiff was precluded from performing work as of December 1, 2004. (Tr. 42, 660-61.)

## C. The plaintiff's Assertions of Error

The plaintiff contends that the record medical evidence does not support her amended AOD and that ALJ erred in failing to obtain her written consent "or any other consent" before amending her AOD. Docket Entry No. 20, at 8-12. She also argues that her non-attorney representative's verbal agreement with the ALJ to amend her AOD should not be binding on her. Docket Entry No. 20, at 12-14.

### 1. The record evidence does not support the plaintiff's amended AOD.

The plaintiff contends that the record evidence does not support the ALJ's decision to amend her AOD to December 1, 2004. Docket Entry No. 20, at 10-12. Specifically, the plaintiff argues that the AOD "chosen by the ALJ was not supported by the medical evidence the ALJ cited (the records of Dr. Brod) because Dr. Brod was not the treating source who completed the Medical Source Statement which the ALJ found persuasive." Docket Entry No. 20, at 11. The Court agrees with the plaintiff.

At the hearing, the plaintiff, through her representative, and with the urging of the ALJ, amended her alleged onset date from December 31, 1998, to December 1, 2004 (tr. 647-48), since Dr. Brod, who the ALJ believed to have authored the January 23, 2006, Medical Source Statement upon which the ALJ relied to make his RFC determination (tr. 648), first examined the plaintiff in December of 2004. (Tr. 536-38.) However, the ALJ incorrectly attributed the January 23, 2006,

-23-

Medical Source Statement to Dr. Brod instead of correctly attributing it to Dr. Porch, the plaintiff's treating urologist. (Tr. 527-29.) The ALJ's confusion as to who authored the January 23, 2006, Medical Source Statement is significant since he suggested that the onset date be amended to the month in which the medical professional who completed that Medical Source Statement first examined the plaintiff. (Tr. 648.)

Dr. Porch examined the plaintiff on multiple occasions between September of 2003, and January 23, 2006, when he completed the Medical Source Statement, and he repeatedly diagnosed the plaintiff with abdominal pain, urinary frequency, and interstitial cystitis. (Tr. 182, 243-46, 252, 256-57, 527-29, 599, 601, 606-07, 614, 616, 619.) In his Medical Source Statement, Dr. Porch attributed the plaintiff's limitations to her interstitial cystitis and chronic bladder pain (tr. 528-29), and the ALJ assigned "controlling [weight]" to those findings. (Tr. 42.) The ALJ listed the plaintiff's cystitis and her status after multiple bladder surgeries as two of her impairments and, primarily due to Dr. Porch's Medical Source Statement, concluded that the plaintiff had the RFC to perform less than sedentary work. (Tr. 41-42.) The ALJ's considerable reliance on Dr. Porch's Medical Source Statement underscores the significance of his error in attributing that evaluation to Dr. Brod because Dr. Porch first diagnosed the plaintiff with abdominal pain and frequent urination in September of 2003, over two months before her date last insured. (Tr. 257.) Further, the record indicates that the plaintiff was first diagnosed with frequent urination in September of 2002 (tr. 214), was first diagnosed with abdominal pain in December of 2002 (tr. 208), and was first diagnosed with ovarian cysts in March of 2003. (Tr. 316.)

The defendant suggests that the ALJ "may have confused" the author of the January 23, 2006, Medical Source Statement, but that such confusion does not require remand because the

-24-

record does not demonstrate disability prior to the amended AOD.  Docket Entry No. 23, at 18.  This argument is flawed.  First, there is no question that the ALJ was "confused."  Most significantly, it is clear that the ALJ suggested that the plaintiff's AOD be amended to December 1, 2004, because the plaintiff began seeing Dr. Brod on December 1, 2004. (Tr. 648.)  Since the ALJ relied on the January 23, 2006, Medical Source Statement that he erroneously believed Dr. Brod authored, the ALJ correlated the amended AOD with the date the plaintiff began treatment with Dr. Brod.  It is not at all clear that the ALJ would have chosen the same amended AOD if he had realized the January 23, 2006, Medical Source Statement was authored by Dr. Porch, who had treated the plaintiff since 2003.  These circumstances are not analogous to "deficiencies in opinion-writing," simply a "misstatement" of a doctor's name, or a less than "perfect opinion," as the defendant suggests. *See* Docket Entry No. 23, at 18.  Instead, erroneously attributing the January 23, 2006, Medical Source Statement to Dr. Brod is significant because the ALJ ties the plaintiff's AOD to the date she began treatment with the author of the Medical Source Statement.  Thus, such a mistake may have had a "practical effect on the outcome of the case." *See Senne v. Apfel*, 198 F.3d 1065, 1067 (8th Cir. 1999).

In sum, the ALJ's decision to deny DIB to the plaintiff, based on an amended AOD, is not supported by substantial evidence in the record because he incorrectly attributed Dr. Porch's January 23, 2006, Medical Source Statement to Dr. Brod and because the record evidence indicates that the plaintiff's symptoms of abdominal pain and urinary difficulty began in 2002.  The Court will not address the plaintiff's two remaining assertions of error since both assertions challenge the validity of the plaintiff's consent to her amended AOD. Docket Entry No. 20, at 8-10, 12-14.  Since

the basis upon which the ALJ sought an amended AOD was erroneous, the plaintiff's consent to an amended AOD is rendered invalid.

## VI. RECOMMENDATION

For the above stated reasons, it is respectfully recommended that the plaintiff's motion for judgment on the record (Docket Entry No. 19) be GRANTED to the extent that the case should be remanded to the ALJ to properly evaluate the plaintiff's AOD given the weight that he assigned to the January 23, 2006, Medical Source Statement, taking into account that it was not authored by Dr. Brod but by Dr. Porch, who began treating the plaintiff in 2003.

Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this Report and Recommendation and must state with particularity the specific portions of the Report and Recommendation to which objection is made. Failure to file written objections within the specified time can be deemed a waiver of the right to appeal the District Court's Order regarding the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

JULIET GRIFFIN
United States Magistrate Judge